UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CARL LEE ASHLEY,

                              Plaintiff,              Civil Action No. 19-10484

v.                                                   Mark A. Goldsmith
                                                     United States District Judge

MARY BOAYUE, *et al.*,                               David R. Grand
                                                     United States Magistrate Judge

                     Defendants.
_____/

## REPORT AND RECOMMENDATION ON
## DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 72, 73)

*Pro se* plaintiff Carl Lee Ashley ("Ashley"), an incarcerated person, brings this civil

rights action pursuant to 42 U.S.C. § 1983, against employees of the Michigan Department

of Corrections ("MDOC") and others who provided him with medical care.  (ECF No. 1).

An Order of Reference was entered on July 19, 2019, referring all pretrial matters to the

undersigned pursuant to 28 U.S.C. § 636(b).  (ECF No. 25).

Before the Court are two motions for summary judgment filed on June 7, 2021, one

by MDOC employees Lana McCarthy, Sirena Landfair, David Brazee, Don Spaulding,

Kim Schaub, and Mary Arends (collectively, the "MDOC Defendants"), and another by

Mary Boayue, P.A. ("Boayue").  (ECF Nos. 72, 73).  Ashley filed separate responses to

these motions.  (ECF Nos. 79, 83).  Boayue filed a reply.  (ECF No. 80).

On October 27, 2021, the Court held oral argument on defendants' motions.

## I.     RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that the MDOC Defendants' Motion for Summary Judgment **(ECF No. 72)**, and Boayue's Motion for Summary Judgment **(ECF No. 73)** be **GRANTED**.

## II.    REPORT

### A.     Brief Factual Background

Ashley is a MDOC prisoner who is currently confined at the Lakeland Correctional Facility in Coldwater, Michigan.  He brings this § 1983 civil rights action, alleging violations of his First and Eighth Amendment rights.  (ECF No. 1, PageID.39-41).  At the time of the events at issue in his complaint, Ashley was housed at the G. Robert Cotton Correctional Facility ("CCF") in Jackson, Michigan, and the Muskegon Correctional Facility ("MCF") in Muskegon, Michigan.

On March 14, 2019, the Honorable Mark A. Goldsmith screened the complaint pursuant to the Prison Litigation Reform Act ("PLRA"), 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b), summarizing the allegations in Ashley's complaint as follows:

> Plaintiff's claims center around the medical care and supplies he received (or did not receive) for his medical condition.  In May 2015, Plaintiff was diagnosed with bladder cancer.  On January 27, 2016, he underwent surgery for the removal of his bladder and prostate.  After removal of Plaintiff's bladder, he was provided with an urostomy with ileal conduit.  Two days after surgery, Plaintiff was discharged from the University of Michigan Hospital with supplies to care for his ostomy for one month.  He was also provided with a one-year prescription for these supplies.  A wound care nurse at the University of Michigan Ostomy Nursing Services also recommended that Plaintiff be provided a pair of belt-loop pants rather than the MDOC standard issue elastic waistband pants.  The belt-loop pants would allow him to properly situate the urine pouch inside the pants to prevent blockage of the pouch

2

which could cause seepage, skin irritation, and infection.

Plaintiff alleges that Defendants failed to provide him with the necessary supplies for proper ostomy care and failed to provide him with belt-loop pants.  He details his repeated and often fruitless efforts to obtain these items.  He claims to have had at least five urinary tract infections because he was not provided with appropriate supplies and the Defendants failed to provide treatment for his resulting infections.

Plaintiff also alleges that Defendant Boayue confiscated his medical supplies in retaliation for his filing grievances.

(ECF No. 6, PageID.187-88).  Based on these allegations, Ashley seeks, among other relief, declaratory judgment and money damages.  (ECF No. 1, PageID.41-43).

Both the MDOC Defendants and Boayue now separately move for summary judgment, arguing that Ashley failed to raise a material question of fact as to his Eighth Amendment deliberate indifference claims.[1]  Boayue also argues that Ashley failed to raise a material question of fact as to his First Amendment retaliation claim.

The Court has thoroughly reviewed the entire record in this matter, including the parties' briefs and their supporting exhibits.  Due to the lengthy factual record pertaining to multiple claims against defendants at different times, instead of summarizing all of that information here, the Court will provide the relevant facts before addressing each issue, and provide citations to the record as necessary in its discussion of the parties' arguments.

## B.    Standards of Review

Pursuant to Federal Rule of Civil Procedure 56, the Court will grant summary

---

[1] The MDOC Defendants also argue that they are entitled to qualified immunity. (ECF No. 72, PageID.675-77).  However, because the Court finds that Ashley failed to raise a genuine issue of material fact on the merits of his claims, the Court declines to separately consider this issue.

judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Pittman v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011).  A fact is material if it might affect the outcome of the case under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, the Court assumes the truth of the non-moving party's evidence and construes all reasonable inferences from that evidence in the light most favorable to the non-moving party.  *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).

The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion and must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009).  "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'"  *Wrench LLC v. Taco Bell Corp.,* 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).  In response to a summary judgment motion, the opposing party may not rest on its pleadings, nor "'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion."  *Alexander*, 576 F.3d at 558 (internal quotations omitted).

C.      **Analysis**

1. **Eighth Amendment Deliberate Indifference**

Primarily at issue in this case are a series of events regarding defendants' handling of medical supplies prescribed and/or recommended for Ashley's ostomy care after his bladder surgery.  In brief, Ashley first asserts that, during his time at CCF, Boayue and MDOC Defendants Landfair and McCarthy were deliberately indifferent by not properly providing him with the prescribed and recommended supplies for effective ostomy care, which caused him to suffer several urinary tract infections ("UTIs").  Second, he asserts that, after his transfer to MCF, MDOC Defendants Schaub, Brazee, Spaulding, and Arends were deliberately indifferent by failing to properly order belt loop pants, which also caused UTIs and scarring of his ureters.

The Court will address the Eighth Amendment issues arising out of CCF and MCF in turn, providing a summary of the relevant evidence prior to its analysis.

a. **Claims arising out of CCF**

i. Medical Care from January 2016 to September 2016

On January 27, 2016,[2] Ashley received surgery for bladder cancer with Dr. Khaled Hafez at the University of Michigan ("U of M").  (ECF No. 1, PageID.85).  Before his discharge, Dr. Hafez issued an ostomy prescription for, in relevant part, "4" Flat Size 2 ¼" Hollister Skin Barriers; "2" Size 2 1/4" Urostomy Hollister Pouches; "1" Coloplast Leg Bag # 5161; and "1" Night Drainage Bag.  (ECF No. 1, PageID.52).  The top of the

---

[2] Unless otherwise noted, dates in this section for claims arising at CCF refer to the year 2016.

5

prescription states, "Please dispense 20 changes per month; 11 refills." (*Id.*).

After his return to CCF, Ashley met Boayue on February 10th to discuss his urostomy supplies and potential issues posed by wearing the standard MDOC elastic waistband pants. (ECF No. 1, PageID.53; ECF No. 73-2, PageID.802-3; ECF No. 73-4, PageID.1095). One week later, Ashley "experience[ed] breakdown at the site to urostomy with inappropriate leakage through[] the wafer connecting the ostomy appliance" (ECF No. 73-2, PageID.824), so Boayue sent an "Urgent" evaluation request for treatment at U of M for a "Muco-dermal sep[a]ration of the ostomy." (*Id.*, PageID.827).

After treatment, on February 24th, a U of M ostomy nurse gave Boayue a letter with "new recommendations" to "Change appliance twice per week. Treat peristomal skin and junction separation using the stoma powder with skin prep dabbed on. Once skin healed stop using treatment. Reconvene the convex barrier [and] pouch." (ECF No. 73-2, PageID.833, 944). On February 29th, Boayue signed off on the letter, and ordered "(2) weekly 2 ¼ inch flat wafer w/ floating flange; (2) weekly 1/4 inch drainable pouch; (1) monthly stoma powder; (1) monthly skin prep," and also issued a Special Accommodation Notice ("SAN") for "extra length pants with belt loops and belt." (ECF No. 73-2, PageID.833-35, 837; ECF No. 73-5, PageID.1136).

On March 10th, during a follow up at U of M, Ashley was noted as having "been doing very well" with no worrisome findings. (ECF No. 73-2, PageID.936). During his visit, he told Jane Theriault, RN, that he used a flat pouching system because "the prison is slow to order new convex supplies." (ECF No. 1, PageID.63). Theriault wrote a new prescription for a 2-piece convex pouching system, stating, "20 (Twenty) each" of

"Hollister barrier 14903 with pouch 18902," and "Refill: 11 (Eleven)."  (ECF No. 1, PageID.64).

On March 17th, Boayue noted that Ashley's "urostomy supplies were reviewed and reconciled with current supplies and U of M orders."  (ECF No. 73-2, PageID.840-41; ECF No. 73-4, PageID.1136).  On March 26th, he filed a kite because his order of convex flanges "is back ordered," and he only had "two [flat flanges] left," which would last him "a week."  (ECF No. 1, PageID.65).  On the 29th, he received eight sets of flat flanges and pouches.  (ECF No. 73-2, PageID.847).  From this point, Ashley filed a series of similar health care kites and grievances, asserting that he was not properly receiving supplies for ostomy care as prescribed.

In the month of April, Ashley filed Grievance JCF-2016-04-0800-12F3 (the "12F3-Grievance"), stating that he was not receiving 20 changes per month of convex flanges. (ECF No. 73-2, PageID.1030).  His grievance was denied because his U of M note in March did "not reflect the number [of supplies] to be issued," and that, "Per MDOC Nurse Advisory Committee guidelines 302A inmate is to receive 2 colostomy bags/week and 2 wafer per week."  (ECF No. 73-3, PageID.1031).  He also filed a kite because the "urine eats through the paste quickly," so he needed to change his flat flanges every "1½ - 2 days," and he needed new leg/night drainage bags[3] (or a cleaning solution) to prevent bacterial

---

[3] According to Ashley, a leg bag "is a urinary drainage b[a]g that you strap to your leg just below your knee.  It has a tube that comes up and has drainage and adaptor that connects to the bottom of the urostomy pouch and it drains straight down into the leg bag."  (Ashley dep., PageID.1056-57).  This is different from a "night drainage bag," which "holds more volume of urine so you connect that just like you do the leg bag except you hang it on the edge of the bed . . . and then you just go to sleep."  (*Id.*, PageID.1057).

infections.  (ECF No. 1, PageID.67).

On April 26th, he received eight sets of flat flanges and pouches, but he filed a kite on the 30th, stating that he already used three sets and would need more "to make it through the month."  (ECF No. 1, PageID.70).  At the end of April, Boayue informed Ashley that his SAN for belt loop pants was discontinued because the Warden deemed it "a threat to institutional order and security."  (ECF No. 73-5, PageID.1035, 1137).

In the month of May, Ashley filed a grievance complaining that Boayue rescinded the SAN without "an examination" or exploring "other options."  (ECF No. 73-3, PageID.1035).  He further complained that Boayue "has allowed her medical judgment to be undermined by non-medical staff."  (*Id.*, PageID.1034).  He also filed a kite for a possible UTI due to pain, nausea, and odor in his urine, and when a urinalysis three days later showed "1+ Leukocytes and positive for Nitrates dipstick," Boayue ordered treatment of 10 days with "bactrim DS for UTI."  (ECF No. 1, PageID.73; ECF No. 73-2, PageID.855-58; ECF No. 73-5, PageID.1137).

Around May 17th, he received five sets of changes, but he filed a kite on the 24th, stating that he would need more supplies "before" the 27th.  (ECF No. 1, PageID.75).  On the 26th, he was given eight sets of changes.  (Ashley dep., PageID.1111-12).  That same day, he appealed the denial of his 12F3-Grievance to Step II, stating that he still had not received "the proper urostomy flanges or amount prescribed by Dr. Hafez," nor a "night drainage bag or the solutions to clean/sanitize the equipment," which has caused "skin infections and rashes."  (ECF No. 73-3, PageID.1028).  On the 31st, he received eight sets of changes.  (ECF No. 1, PageID.19; ECF No. 73-3, PageID.1029).

On June 9th, Ashley's cell was shaken down, and nine sets of changes were found in his cell.  (ECF No. 73-2, PageID.887; Ashley dep., PageID.1113).  On the 11th, he was called out to bring his supplies to Boayue's office, he was "given 2 sets of urostomy supplies," and "the rest [were] retained in clinic" because "[h]e is ordered 2 set[s] per week" and "nursing staff is giving him too many supplies."  (ECF No. 73-2, PageID.887).  Later that day, Ashley filed a kite that he will "need more [changes] on the 14th."  (ECF No. 1, PageID.78).  On the 15th, he received two more sets of changes, and on the 24th, he received another eight sets.  (ECF No. 1, PageID.95; ECF No. 73-2, PageID.891).

On June 30th, Ashley had a follow up at U of M with Dr. Hafez, who noted:

> [Ashley] has been doing very well.  He has good appetite and BM are regular with Miralax.  He has resumed his normal activities and works out regularly.  He notices some swelling in the right inguinal region and may have an inguinal hernia.  He is changing his ostomy appliance every 2 days.  He has had an issue with obtaining the convex phalange previously recommended by our ostomy RN to help alleviate leakage issues.  He has been using what is available to him which includes a flat phalange with paste.  He notes that he can spring unexpected leakage during the night.  Our ostomy RN did speak with the PA at the prison and re faxed the order for the appropriate supplies and possible alternatives.  He had a UTI 2 months ago.  He presented with flank pain, odor, and dark urine.  He was treated with Bactrim DS for 10 days.  He denies fever, chills, nausea, vomiting, abdominal pain, flank pain, hematuria, or penile discharge.

(ECF No. 1, PageID.85-86).  Under plan of care, Dr. Hafez further noted:

> Recommendations regarding ostomy supplies was sent back with Mr. Ashley for Corizon Michigan Department of Corrections to assist him in obtaining the correct ostomy supplies in order to prevent unexpected leakage and peristomal irritation.  He requires a Convex 2 piece Hollister urostomy pouching system.  Our ostomy RN Jane Theriault had previously addressed this issue with Mary [Boayue], PA.  She mentioned that the Hollister convex barriers were on order but they were awaiting delivery.  In the interim, the patient must use what is

9

> available at the prison.  Jane re faxed the orders along with a list of other
> possible pouch substitutes patient could use[].  It was felt that this would
> be health manager at the prison who order supplies.

(*Id.*, PageID.92).  Dr. Hafez also noted that Ashley should "consider cranberry tablets or

cranberry juice daily for urine acidification for UTI prophylaxis." (*Id.*).

In the month of July,[4] Ashley filed several kites for a possible UTI based on pain,

nausea, and odor in urine, so he was evaluated and treated with Bactrim on the 12th.  (*Id.*,

PageID.94, 96-97, 99-101; *see also id.*, PageID.108-109).  He then filed Grievance JCF-

1607-1466-12D3 (the "12D3-Grievance), stating that his UTI was due to a "failure/refusal

to provide the proper urostomy flange which has allowed the urine to pool around his stoma

site and bacteria to grow." (ECF No. 73-3, PageID.1020).

Throughout the month of August, Ashley filed a similar series of kites for more

supplies.[5]  On August 11th, he received a response to the 12D3-Greivance from Marguerite

Howard, RN, stating that she ordered his requests for "Convex two piece urostomy

pouching system" and "appropriate [leg/night] drainage bags."    (ECF No. 73-3,

---

[4] Ashley also filed a series of kites for more flat flanges and pouches.  On the 6th, he said he would use his last set of changes on the 11th. (ECF No. 1, PageID.95).  He received two sets on the 12th, and then filed a kite on the 13th, stating that he would use his "last one" on the 15th.  (*Id.*, PageID.102).  He requested more on the 16th and received two sets of change on the 17th, and then requested more on the 19th and received two more sets on the 20th. (ECF No. 1, PageID.104, 107; ECF No. 73-2, PageID.898).  On the 26th, he received two pouches.  (ECF No. 73-2, PageID.900).  On July 29th, he asked for more supplies by August 2nd, and received two sets of changes on August 1st.  (ECF No. 1, PageID.110; ECF No. 73-2, PageID.902).

[5] On August 2nd, Ashley requested more supplies by the 5th, and received two sets of changes on the 5th. (ECF No. 1-1, PageID.111, 114).  Later that same day, he requested more supplies by the 9th, and he received two sets on the 9th. (ECF No. 1-1, PageID.114).  The next day, he filed a kite for more supplies, and two days later he received five sets of changes. (ECF No. 1-1, PageID.117, 120).  On the 20th, he filed a kite for more supplies by the 23rd, and a nurse visit was scheduled for the 23rd.  (ECF No. 73-2, PageID.916).

PageID.1021; *see also* ECF No. 1-1, PageID.119 ("Prisoner to receive One leg bag and One night time bag a month for supplies").  On the 15th, Boayue noted that Ashley "is currently experiencing breakdown at the site to urostomy with inappropriate leakage through[] the wafer connecting the ostomy appliance.  Is currently awaiting arrival of correct ostomy appliance and supplies that have been ordered."  (ECF No. 73-2, PageID.911).  When Ashley requested "for his [] supplies to be increased to 3 changes per week," Boayue informed him that "[t]his request i[s] inappropriate due to mucosal/dermal separation that took place for which he had to be seen emergently by urostomy nurses at U of M.  Their recommendation was for there to be only 2 changes per week."  (*Id.*, PageID.913).

On August 24th, he filed a kite, stating that he was not being treated for his UTI, which "has been present since early July."  (*Id.*, PageID.121).  On the 26th, Boayue placed him on a third round of Bactrim, but noted that he was "restricted for compliance" because she "strongly suspect[ed]" that he was "purposefully" not taking his antibiotics so that he could "escalate [the situation] into a hospitalization."  (ECF No. 72-3, PageID.721).  On the 30th, Ashley received eight sets of changes, a leg bag, and a "monthly night bag." (ECF No. 73-2, PageID.916-17).

In September, Ashley filed a kite on the 5th for continuing symptoms of a UTI, and he received a urinalysis on the 7th.  (ECF No. 1-1, PageID.124, 129-30).  That same day, he also received two convex flanges and pouches.  (ECF No. 1-1, PageID.131).[6]  On

---

[6] On the 13th, Ashley filed a kite stating that he uses his convex set of changes "every 3 days," so he needed more.  (*Id.*).  The next day, he received two more convex sets.  (ECF No. 73-2,

September 21st, Ashley saw Boayue for "result and f/u of U/A [] and confirmation of received urostomy supplies." (ECF No. 72-3, PageID.727). He was negative for fatigue, fever, and other issues except for reported bilateral back pain, which Boayue noted were "out of proportion to vitals and presenting demeanor." (*Id.*, PageID.728). Physical exams were noted as normal, and Ashley was "informed that U/A is improved from previous lab results and that a completely normal U/A may not be normal for him due to his urinary diversion w/ urostomy. He was assured that all of his vitals are stable, no worrisome objective findings. (*Id.*).

On September 29th, Ashley was transferred to Chippewa Correctional Facility ("URF"). (ECF No. 73-2, PageID.925). An "Intrasy[s]tem Transfer Summary" report for Ashley by Maria Bennett, RN, of URF noted that "[Ashley] does not have current medical . . . complaint(s)/concern(s)," did not present irregular "Objective" findings, and was "cleared to General Housing." (*Id.*, PageID.925-26).

        ii. <u>Ashley fails to raise a material question of fact that he received grossly inadequate medical care at CCF for his ostomy needs</u>

Defendants both move for summary judgment on Ashley's deliberate-indifference claims. In response, Ashley argues that Boayue, Housing Unit Manager McCarthy, and Nurse Landfair failed to order or provide "the necessary supplies for ostomy care" because they failed to "follow a specialist's prescriptions for those supplies," causing "skin irritations, urinary tract infections, and possible kidney damage." (ECF No. 79,

---

PageID.918). On the 20th, he stated he needed more sets of changes "immediately" (ECF No. 1-1, PageID.132), and the next day, he received 2 more sets (ECF No. 73-2, PageID.921).

PageID.1159, 1166; ECF No. 83, PageID.1205).   "Where prison officials are so deliberately indifferent to the serious medical needs of prisoners as to unnecessarily and wantonly inflict pain, they impose cruel and unusual punishment in violation of the Eighth Amendment."  *Horn by Parks v. Madison Cnty. Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994), *cert. denied*, 513 U.S. 873 (1994) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  It is well settled that a claim for deliberate indifference under the Eighth Amendment "has both an objective and a subjective component."  *Broyles v. Correctional Medical Servs., Inc.*, 478 F. App'x. 971, 975 (6th Cir. 2012).

With respect to the objective component, Boayue argues that Ashley may disagree with "the decision to use flat [] rather than convex [] flanges" or to provide "two [] supplies change per week," but he "received adequate and significant medical care in response to each of [his] numerous healthcare related complaints."  (ECF No. 73, PageID.767).  She also asserts that he is "unable to provide verifying medical evidence which demonstrates [any] detrimental effect of [any alleged] delay in treatment, as the evidence simply does not exist."  (*Id.*, PageID.767-68).  The MDOC Defendants similarly argue that Ashley's claim is a "dispute over the amount of supplies, i.e. a dispute over the adequacy of his care."  (ECF No. 72, PageID.670-72).  They assert that Landfair and McCarthy "did not have the authority to prescribe treatment or medication" and were "always prompt in reordering or providing supplies to Ashley" as "deemed necessary" by his medical providers.  (*Id.*, PageID.671-72).

Notably, during the October 27th hearing, the MDOC Defendants cited to the Sixth Circuit's recently published decision in *Phillips v. Tangilag*, 14 F.4th 524 (6th Cir. 2021),

13

as controlling in this case.  After careful review, the Court agrees that MDOC Defendants and Boayue are entitled to summary judgment under *Phillips*.

In *Phillips*, the Sixth Circuit determined that the plaintiff inmate could not "rely on his serious medical needs alone to establish the objective element of his deliberate-indifference claim" where the evidence showed that he "received extensive care."  14 F.4th at 536.  The Sixth Circuit held that because the plaintiff's claim "challenges the adequacy of this undisputed care, he must show that the doctors provided grossly incompetent treatment."  *Id.*  The court further explained its reasoning as follows:

> To prove [an] objectively serious harm in the health context, prisoners must first establish that they have "serious medical needs."  They can do so, for example, by showing that a doctor has diagnosed a condition as requiring treatment or that the prisoner has an obvious problem that any layperson would agree necessitates care.  A serious medical need alone can satisfy this objective element if doctors effectively provide no care for it.  More frequently, doctors provide some care and prisoners challenge their treatment choices as inadequate.  To establish the objective element in this common situation, prisoners must show more.  Objectively speaking, this care qualifies as "cruel and unusual" only if it is "so grossly incompetent" or so grossly "inadequate" as to "shock the conscience" or "be intolerable to fundamental fairness."  Ordinary individuals outside a prison's walls and inmates within those walls both face a risk that their doctors will perform incompetently. . . . But mere malpractice does not violate the Eighth Amendment.  Only grossly or woefully inadequate care – not just care that falls below a professional standard – can be called "cruel and unusual."  For prisoners to prove grossly inadequate care, moreover, courts generally require them to introduce medical evidence, typically in the form of expert testimony.

14 F.4th at 534-36 (internal citations omitted).  Because the plaintiff failed to introduce "***expert medical evidence*** describing what a competent doctor would have done and ***why the chosen course was not just incompetent but grossly so***," the Sixth Circuit found that his claim of deliberate indifference could not "get past the objective stage."  *Id.* at 537

14

(emphasis added).  Ashley's deliberate indifference claim fails under the *Phillips* standards.

As an initial matter, there is no dispute that Ashley had a serious medical need for ostomy care after his bladder surgery.  At the same time, it is undisputed that the record contains a litany of evidence documenting the extensive medical care he received throughout his time at CCF between January and September 2019.  Thus, his deliberate-indifference claims clearly challenge the *adequacy* of the medical care he was provided. (*See, e.g.*, ECF No. 1, PageID.82 ("My claim was never that I was not receiving ANY supplies.  The claim is that I am not receiving the ORDERED supplies such as convex shaped flanges, night drainage bag, or cleaning supplies to prevent bacterial infections.")); *Santiago v. Ringle*, 734 F.3d 585, 591 (6th Cir. 2013) ("But [plaintiff] does not allege that he received *no* medical treatment . . . indeed, he continued to receive the medications [] previously prescribed while he waited for the dermatologist's recommended treatments. Instead, [plaintiff] complains that he was delayed in receiving a *specific type* of medical treatment, the dermatologist's recommendations.  He therefore disputes the adequacy of the treatment he received during that period.") (emphasis in original).

Here, the parties do not dispute that U of M Dr. Hafez prescribed certain supplies for ostomy care after Ashley's bladder surgery that were not promptly ordered and issued to him as was specifically prescribed.[7]  As for flanges, though Dr. Hafez initially prescribed

---

[7] The Court notes that the parties' briefings on the issue surrounding the "ordering" of convex flanges is, at best, sparse.  Though there is some evidence in the record indicating that convex flanges may have been "backordered" as early as March 2016, and eventually ordered and obtained by August 2016, defendants did not cite to specific evidence in the record clarifying the issue, and MDOC Defendants conceded at the hearing that the record is "murky."  Thus, in the absence of

"flat" shapes, he later changed his prescription to "convex" shapes in March 2016 "to help alleviate leakage issues," characterizing them as the "appropriate" and "correct ostomy supplies [for] prevent[ing] unexpected leakage and peristomal irritation." (ECF No. 1, PageID.85-86, 92).  As for leg/night drainage bags, his prescription reflects dispensing a quantity of "1" of each bag per month.  (*Id.*; *see* ECF No. 1-1, PageID.119).  Moreover, while not "prescribed" by Dr. Hafez, there is no dispute that Boayue initially issued a SAN for belt loop pants, but later rescinded it because the Warden deemed it a security risk, and no alternatives were provided.  Finally, at a minimum, Ashley was diagnosed with several UTIs during the relevant eight-month period at CCF.

Nonetheless, because the record indisputably establishes that Ashley was consistently provided with medical care for his ostomy needs (meaning his is not a case where he was "effectively provide[d] no care"), as *Phillips* makes clear, the salient question for the objective component is not whether defendants were incompetent or even committed medical malpractice in the care they provided, but whether Ashley presented "expert medical evidence" raising a material factual question that the extensive medical care he received was "so grossly incompetent or so grossly inadequate as to shock the conscience or be intolerable to fundamental fairness."  *Phillips*, 14 F.4th at 535, 537 (quotations omitted) ("In this case, [plaintiff] received substantial care and challenges the medical judgments of medical professionals.  Our cases require expert testimony for this [] type of challenge.").  Upon thorough review of the record, the Court finds that Ashley

---

clear evidence to the contrary, the Court's view of the record in favor of Ashley indicates that convex flanges were not being promptly ordered.

cannot "get past the objective stage" of his deliberate indifference claims "because he lacks any expert medical evidence showing that he received *grossly inadequate care*" for his ostomy needs based on defendants' handling of flanges, drainage bags, belt loop pants, and UTIs. *Id.* at 536 (emphasis added).

### (A) Flanges

As an initial matter, while undisputed that convex flanges were more effective, Ashley admitted at the October 27th hearing that flat flanges were sufficient for his needs if he had *enough* of them, stating it was his position that he either needed the convex flanges that lasted longer, or *an adequate supply* of the flat flanges. This representation is consistent with other evidence in the record. For example, Ashley testified at his deposition that "[u]sually [flat flanges] would last [three or four days] with *no problems*," but that they would occasionally not last that long. (Ashley dep., PageID.1066-67) (emphasis added). Moreover, while Ashley did consistently complain about not receiving *convex flanges*, in multiple medical kites he requested additional *flat flanges*, again indicating they would work for him as long as he had an adequate supply. (ECF No. 1, PageID.65, 70, 75, 78, 102, 104). As such, the issue with respect to flanges boils down to whether Ashley raised material factual questions that defendants' provision of flat flanges was so grossly inadequate for his ostomy needs that it "shock[s] the conscience" or is "intolerable to fundamental fairness." *Phillips*, 14 F. 4th at 534-36. He fails to do so.

Here, between January and September 2016, Ashley admits that he "never actually physically ran out of the flat [flanges]" *except on "two" occasions*, and that there would even be times where he had an *excess* supply. (Ashley dep., PageID.1068-69; PageID.1065

17

("another nurse [] would give me ten, another nurse would give me eight, give me all the month's supply ahead of time and sometimes they were overlapping each other and sometimes I had more than what I needed"); *see also* ECF No. 73-2, PageID.887; ECF No. 73-3, PageID.1029). Thus, his claim essentially rests on these "two times that I sat [in health care] and [the urine] was leaking while waiting for more supplies because they had restricted to two per week and more was needed." (Ashley dep., PageID.1071). On both occasions, however, Ashley admits that he received a replacement at least "by the end of the day," (ECF No. 73-4, PageID.1071), and otherwise does not recall ever being "sent back to [his] cell when called out without receiving a replacement." (ECF No. 73-4, PageID.1071). At most, these two occasions show that defendants caused a *brief delay* in his replacement of flat flanges, and Ashley "presented no medical evidence showing that any [such] delay [] exacerbated any harm." *Phillips*, 14 F.4th at 538-39 ("But this type of claim (that doctors delay care) typically requires expert medical testimony too. [Plaintiff] needed to 'place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment.'") (quoting *Napier v. Madison Cnty., Ky.*, 238 F.3d 739, 742 (6th Cir. 2001)); *Santiago*, 734 F.3d at 590.

As to the first occasion, Ashley testified that Landfair kept him waiting in health care from 9:30 AM to 4:00 PM before she eventually "left and went home" without providing a replacement. (Ashley dep., PageID.1068-69). He then asked a "new nurse" on the "new shift," who got replacements to him "right away within [] 30 minutes." (*Id.*, PageID.1069). While his testimony establishes that such incident occurred, it fails to provide any details about the whether he experienced or communicated any level of pain

18

while waiting for the supplies.  Instead, he admitted that, though Boayue, McCarthy, and "other nurses doing other clinical duties" were also present at health care that day, he did not "express to [any] of those individuals that [he was] waiting for a replacement."  (*Id.*, PageID.1070).  Simply put, this vague testimony about a single incident of a brief delay in being provided a replacement flange and pouch, without any verifying medical evidence of its detrimental effect, is insufficient to establish grossly incompetent care rising to "cruel and unusual" punishment that "shocks the conscience."  *Phillips*, 14 F.4th at 538-39.  As for the "second time," Ashley does not "remember anything about [it]," and testified only that it was "pretty much the same thing both times."  (ECF No. 73-4, PageID.1070).  Thus, there is no reason to treat that incident differently than the first.  And, given the complete absence of medical evidence about a detrimental effect caused by the delays, even considering the two incidents together would not alter the analysis.

Finally, it is worth noting that, though Ashley filed numerous kites and grievances, they are predominantly (if not entirely) preemptive in nature.  As detailed above, his kites and grievances consistently inform medical personnel on ***what future date he will use his last supply*** and on ***what future date he will need replacements***.  And, it was not uncommon for him to file a kite within a day of receiving new replacements, or sometimes on the same day.  (*See, e.g.*, ECF No. 1, PageID.78, 102; ECF No. 1-1, PageID.111, 114, 117; ECF No. 73-2, PageID.902).  Indeed, his deposition testimony confirms that "it might be three or four days ahead of time when I send the kite."  (Ashley dep., PageID.1072).[8]  Thus, the

---

[8] Though Ashley also asserts he should have received "20 changes per month" as stated in Dr. Hafez's prescription, he admits that it "didn't say how often" he needed to receive those supplies.

mere fact that Ashley submitted a voluminous number of health care kites regarding flanges does not raise a material question of fact that he was not being provided a sufficient quantity to meet his medical needs, let alone that defendants' conduct "shocks the conscience."

### (B) Leg/Night Drainage Bags

Ashley's claims based on a failure to properly provide replacement leg/night drainage bags suffers from the same flaw. Though Ashley testified that UTIs "can be from contaminated or uncleaned leg bags, night drainage bags [containing bacteria]," he is not a qualified medical professional. (Ashley dep., PageID.1075-76). Rather, he admits that "[a] doctor had never actually told [him]" that "the reason why I think you have this urinary tract infection is because you haven't had your leg bag changed out." (Ashley dep., PageID.1076). While he points to packaging from his drainage bags stating that they are for "single use" and should not be cleaned or reused, even U of M Dr. Hafez provided procedures for "daily" and "weekly" "care of [such] drainage bag[s]." (ECF No. 73-1, PageID.783). To the extent he did not have the proper cleaning supplies, there is *no medical evidence* in the record indicating any issues stemming from unclean drainage bags, much less that they were the source of Ashley's UTIs. (ECF No. 1, PageID.63, 85-93; ECF No. 73-2, PageID.936-40). Indeed, neither U of M treatment note in March or June of 2016 mentions leg/night drainage bags, let alone any issues with them, stating instead that Ashley "has been doing very well," "has a good appetite," and denied any worrisome

---

(Ashley dep., PageID.1095). Such an inference is also unsupported by the record, given that Dr. Hafez assessed that Ashley should change his flat flanges every "3-4 days," which would then amount to a monthly supply normally lasting 60 to 80 days. (ECF No. 73-1, PageID.782).

symptoms.  (ECF No. 1, PageID.63, 85-93; ECF No. 73-2, PageID.936-40).

## (C) UTIs

The same analysis applies for the treatment of Ashley's UTIs.  The record is undisputed that Ashley was consistently given antibiotics of Bactrim DS for 10 days when he was diagnosed with UTIs.  (*See, e.g.*, ECF No. 1, PageID.101 ("I have been diagnosed and treated with Bactrim for UTI/kidney infections twice."), PageID.109, PageID.122; ECF No. 72-3, PageID.721; ECF No. 73-2, PageID.855-57).  While he grieved that Boayue failed to treat him for a UTI contracted in July 2016, there is no dispute that Boayue actually treated him for it with Bactrim.  (Ashley dep., PageID.1117 ("In July of 2016, I was diagnosed with a [UTI].  [Boayue] treated me three separate times with three rounds of antibiotics, Bactrim."); ECF No. 1, PageID.109, 122; ECF No. 72-3, PageID.721).  To the extent Ashley takes issue with the use of Bactrim itself, he provides no medical evidence suggesting that this was not a proper course of treatment, and Dr. Hafez's June 2016 note expresses no issues with the administration of such treatment for the UTI he had been diagnosed with in May.  (ECF No. 1, PageID.85).[9]

Moreover, his challenge to Boayue's decision that it was unnecessary to administer more antibiotics by the end of September 2016 is unavailing, as such decision was based on a urinalysis, her examination of Ashley, and her medical assessment that "a completely

---

[9] To the extent Ashley asserts that he required cranberry tablets or juice, this argument is misguided.  Dr. Hafez merely noted that Ashley should "***consider*** cranberry tablets or cranberry juice daily for urine acidification for UTI prophylaxis."  (ECF No. 1, PageID.92).  Even if these supplements would have been helpful, he was treated with antibiotics and presented no medical evidence that cranberry tablets or juice were necessary or would have prevented his UTIs.

normal U/A may not be normal for him due to his urinary diversion w/ urostomy," that his "U/A is improved from previous lab results," and that his vitals were stable with "no worrisome objective findings." (ECF No. 72-3, PageID.728 ("Negative for fatigue, fever . . . vitals are stable, no worrisome objective findings"). While Ashley may disagree with Boayue's judgment, he provides no evidence establishing that it was grossly incompetent. *Phillips*, 14 F.4th at 535, 537 ("In this case, [plaintiff] received substantial care and challenges the medical judgments of medical professionals. Our cases require expert testimony for this [] type of challenge.").

This analysis does not change based on Ashley's assertion that a "Dr. Canlas" at URF treated him with a different antibiotic, "Ciproflaxcin," in October 2016. (ECF No. 79, PageID.1172). Not only does he fail to provide any record citations supporting this assertion, but Ashley himself states that it was for a "condition ***not responding to protocol***," and he has not shown how this alleged failure to apply treatment beyond standard "protocol" amounts to more than medical malpractice. (*Id.*).

Finally, Ashley concedes that the presence of bacteria is not dispositive in assessing UTIs (Ashley dep., PageID.1118-19 ("[t]here is always going to be the presence of bacteria [in my urinalysis]"); *see also* ECF No. 73-2, PageID.923 ("Patient informed that U/A is improved from previous lab results and that a completely normal U/A may not be normal for him due to his urinary diversion w/ urostomy."), and any associated symptoms he asserts he had at that time are belied by Boayue's exam findings and his transfer papers from URF shortly after on September 29th, which notes that Ashley "does not have current medical [] complaint(s)/concern(s)," and no abnormal "Objective" findings. (ECF No. 73-

22

2, PageID.926; *see also* ECF No. 73-2, PageID.923 ("He was assured that all of his vitals are stable, no worrisome objective findings.")).

### (D) <u>Belt Loop Pants</u>

Ashley argues that Boayue initially "recognized the need for belt loop pants and issued a [SAN]," but later, "for non-medical reasons, rescinded the medically necessary belt loop pants." (ECF No. 79, PageID.1174-75). In this case, the undisputed evidence shows that Boayue found a medical need for the SAN when she issued it on February 10, 2016, but later discontinued it on April 27, 2016, on the basis that it was deemed a "security risk" by the Warden. (ECF No. 73-5, PageID.1035, 1137). Ashley also asserts that "MDOC Policy is that the medical professionals make their decision. The warden doesn't make medical decisions." (Ashley dep., PageID.1085). And, when asked for alternatives, Boayue apparently responded, "Well, there is no alternative," and did not otherwise examine him further for the issue. (*Id.*, PageID.1103).

Taking Ashley's facts as true, as the Court must at this stage, his belt-loop-pants claim still suffers from the same deficiencies as his other claims discussed above: the record unequivocally demonstrates Ashley's receipt of extensive treatment for ostomy care throughout his time at CCF, yet Ashley presents no expert medical evidence describing why Boayue's failure to *specifically* provide belt loop pants as part of that regimen of care constitutes "grossly or woefully inadequate care – not just care that falls below a professional standard," so as to "be called 'cruel and unusual.'" *Phillips*, 14 F.4th at 534-37; *see Santiago*, 734 F.3d at 591. As detailed above, there is no mention at all about the need for belt loop pants – or problems caused by not having them – in either of the U of M

23

treatment notes in March and June of 2016, which instead reflect that Ashley was "doing very well," presented no worrisome symptoms, "has resumed his normal activities and works out regularly," and that his only issue with supplies was trying to obtain convex flanges.  (ECF No. 1, PageID.85-86; ECF No. 73-2, PageID.936-37).  Nor does his transfer paperwork to URF reference any issues, much less anything specific to a lack of belt loop pants.  (ECF No. 73-2, PageID.926)).   In short, Ashley at most raises a claim that Boayue's discontinuance of belt loop pants based on a non-medical reason constitutes "inadequate" care, or demonstrates a level of "incompetence" amounting to medical malpractice, which is not actionable under the Eighth Amendment.  *Phillips*, 14 F.4th at 535 (citing *Rhinehart*, 894 F.3d at 737); *see also Comstock v. McCrary,* 273 F.3d 693, 703 (6th Cir. 2001).

For all these reasons, Ashley fails to raise a material factual question that the extensive care he received at CCF from January to September 2016 for his ostomy needs was "so grossly incompetent or so grossly inadequate as to shock the conscience." *Phillips*, 14 F.4th at 535 (quotations omitted).[10]  Accordingly, defendants are entitled to summary judgment as to Ashley's deliberate indifference claim as to each of the foregoing issues.

### b.  Claims arising out of MCF

#### i.  Issue with Belt Loop Pants from February 2017 to January 2018

As for belt loop pants at MCF, MDOC Defendants argue that they "made multiple

---

[10] "Only if a prisoner proves this objective element must courts consider the second (subjective) part of the deliberate-indifference test." *Phillips*, 14 F.4th at 535.  Because the Court finds that Ashley failed to meet the objective component, it need not consider the subjective component.

attempts to provide pants to his liking," and that "[e]ven if the treatment was not efficacious to him during those first few attempts, he [w]as not being denied medical care." (ECF No. 72, PageID.674-75).[11]  While Ashley takes issue with their efforts to provide pants, the salient facts, which are undisputed and set out below, demonstrate the MDOC Defendants are entitled to summary judgment on this issue.

After his transfer to MCF, on February 14, 2017, Dr. Jon W. Decker, D.O., found a medical need for "extra length pants with belt loops" and issued a SAN. (ECF No. 1-1, PageID.139, 145, 158; ECF No. 73-3, PageID.1085).  The next day, Ashley took his SAN to Quartermaster Wilson ("Wilson"), who said they "definitely don't have anything [in his size of 40" waist, 40" inseam] over here." (ECF No. 1-1, PageID.139).

On February 15th,[12] Warehouse Supervisor Kim Schaub ("Schaub") and Wilson directed a prison employee working at the Quartermaster Department to "use the sewing machine . . . to reduce the waist size of a pair of belt loop pants from a 52" waist to a 40" waist," but the closest he could get was a 40-41" waistline, with inseams of 33" in length. (ECF No. 1-1, PageID.138).  Ashley filed a grievance that attempting to "sew together some belt loop pants to comply with the SAN" did not comply with MDOC Policy, which requires that unavailable items "shall be immediately ordered from another source" within "30 calendar days." (*Id.*).

---

[11] Ashley testified at his deposition that his prior "problems with the urostomy supplies c[a]me to an end . . . [a]s soon as I transferred out of the Cotton Facility," and while at MCF, his only issue was a "problem [] with their belt loop pants." (Ashley dep., PageID.1078-79).

[12] Unless otherwise noted, dates in this section for his claims arising out of MCF refer to the year 2017.

On February 28th, Schaub and Wilson called him out to try on the "pair of pants that measured 40-41" waist and 33" inseam," which were too short, but Schaub said these pants were all they had, and that if Ashley did not take them, she was going to have the SAN cancelled.  (ECF No. 1-1, PageID.142, 145; ECF No. 73-3, PageID.996).  After washing the pants, the inseam shrunk to 31 ½".  (ECF No. 1-1, PageID.150).

On March 1st, Ashley filed another grievance, arguing that Schaub tried to rescind the SAN without any medical training or authority.  (ECF No. 73-3, PageID.996).  A Step I response by Business Manager Don Spaulding ("Spaulding") and Acting Deputy Warden Dave Brazee ("Brazee") states that:

> [Schaub] provided 2 pair of pants that were altered to the sizes that Mr. Ashley requested.  Mr. Ashley did not like the fact that the pants were altered and did not meet his definition of wearing his pants at his waist.  His definition of his waist is just below the nipple line which by industry standards is not your waist.  Thus the pants given to him appear to be short.  At this time a new set of pants will be made to meet his criteria.  At this time we are meeting the requirements of serviceable clothing for Mr. Ashley, therefore this grievance is denied.

(ECF No. 73-3, PageID.997).  Ashley appealed to Step II, arguing that no pants were "ordered," and that attempts to "cobble together a pair of pants has caused a kidney/urinary tract infection."  (*Id.*, PageID.998).

On March 16th, Ashley received pants with "belt loops sewn onto the waistband with the elastic still in the waistband," which he "refused to accept."  (ECF No. 1-1, PageID.145).  The next day, Schaub, Brazee, and Spaulding met with Ashley so that he could try on the pants.  (*Id.*).  Those pants were "above [his] ankle . . . about halfway to [his] shin."  (Ashley dep., PageID.1088).  Brazee, Spaulding, and Schaub eventually agreed

that they were going to sew "extensions" onto the legs to make the pants longer, but Ashley said he "would not wear those, [because] that [] would be humiliating." (ECF No. 1-1, PageID.146). Schaub later dropped off a pair of pants with extensions sewn on the legs and "elastic removed from the waistband," which were too long at 45", and too tight on the hips, buttocks, and upper thighs. (*Id.*).

On March 26th, Dr. Decker took a CT scan of Ashley's abdomen and pelvis, which found, in relevant part, "very short segment of right distal ureter nonopacification, otherwise the right ureter is normal. The left proximal and mid ureter are normal. Unfortunately, a slightly longer segment of the left distal ureter is not opacified precluding its accurate evaluation. Uncomplicated urostomy." (ECF No. 1-1, PageID.147).

On November 6th, the new Quartermaster, Mary Arends ("Arends") called out Ashley to measure him for extra length pants with belt loops and was authorized to order fabric to sew a pair of belt loop pants. (ECF No. 1-1, PageID.163). Ashley filed a grievance, stating that Arends acknowledged "that their vendor does not make extra length belt loop pants . . . [and] that she had no Tall or X-Tall items in her inventory," so she is "attempting again to cobble together some extra length belt loop pants, rather than ordering proper fitting pants." (*Id.*, PageID.162-63).

Since that time, Ashley "tried on three separate pair of pants that were not proper fitting" and "were being cobbled together by a prisoner that had never made any pants before." (ECF No. 1-1, PageID.168). For example, on December 4th, Ashley tried on a new pair of sewn pants, but when HUM Wilkerson witnessed that they did not fit properly, Ashley suggested that they either order pants or "go to Joanne Fabrics, get a pattern for the

proper size, Husky style construction, and make the pants properly."  (ECF No. 1-1, PageID.168).  On December 19th, he tried another pair of "homemade pants . . . in the style of sweatpants or scrubs with a drawstring waist . . . of approximately 90 inches, and the crotch was at mid-thigh."  (*Id.*).  Ashley "rejected these pants as not proper fitting."  (*Id.*).

On December 26th, Dr. Decker took another CT scan of Ashley's abdomen and pelvis, noting normal findings with no suspicions, thickening, malignancy, or abnormality, but that "[a] small portion of each distal ureter is suboptimally opacified precluding its accurate evaluation."  (ECF No. 1-1, PageID.169).

Finally, on January 8, 2018, Ashley was measured for belt loop pants, and he received a pair from Michigan States Industries ("MSI") on January 24, 2018.  (ECF No. 83, PageID.1212, 1235).

> ii. Ashley fails to raise a material question of fact that MDOC Defendants' attempts to sew belt loop pants in compliance with the SAN was grossly inadequate for his ostomy needs

In support of their motion for summary judgment, MDOC Defendants present an affidavit from Schaub, stating that she "had been in contact with MSI [] to see if pants could be ordered.  At that time, MSI was not producing prisoner pants; we ordered them through another company which produced the elastic pants that we were using for prisoners.  However, MSI was eventually able to make or modify pants to accommodate Mr. Ashley."  (ECF No. 72-4, PageID.735-36).

In response, Ashley argues that, "[b]y Schaub's own admission, the pants could not 'be provided from [MSI] within 30 calendar days,'" so policy required that "the item shall immediately be ordered from another source," and not "<u>made</u>."  (ECF No. 83,

28

PageID.1221-22) (emphasis in original).  He further asserts that, "[i]nstead of ordering the proper fitting pants from another source," defendants "took eleven months" to provide him pants.  (*Id.*, PageID.1222).

As an initial matter, even assuming the MDOC Defendants failed to follow policy requiring them to ***order*** unavailable items from another source, that would not give rise to a constitutional violation.  *See, e.g.*, *Coleman v. Martin*, 363 F. Supp. 2d 894, 903 (E.D. Mich. 2005) ("the failure of a prison, or the state, to follow its own policies and procedures does not amount to a constitutional violation.").  Moreover, because it is undisputed that Ashley rejected the MDOC Defendants' multiple attempts to construct pants for him, he clearly raises a claim challenging the adequacy of such pants, or that the MDOC Defendants' insistence on sewing pants (instead of ordering them) caused a delay in his receiving a proper pair.  Either way, the law is clear that Ashley was required to present "expert medical evidence" sufficient to raise a material question of fact that the constructed pants were "so grossly inadequate" vis-à-vis the SAN as to "shock the conscience," or that "any delay [] exacerbated any harm."  *Phillips*, 14 F.4th at 535-39.  He fails to do so.

Here, as reflected in the record and as Ashley represented at the October 27th hearing, there is no dispute that, on certain occasions, he rejected the MDOC Defendants' constructed pants because they looked "humiliating" or "embarrassing."  (*See* ECF No. 1-1, PageID.146).  While Ashley may not be satisfied with pants that rose "above [his] ankle . . . halfway to his shin," contained extensions, were not sewn by a tailor, or were otherwise unfashionable in his eyes, such preferences do not render the MDOC Defendants' efforts "cruel and unusual" treatment.

Moreover, as with his claims from CCF, Ashley fatally fails to present any medical evidence demonstrating that he suffered any detrimental effect due to the lack of belt loop pants, much less that MDOC Defendants' constructed pants were grossly inadequate to address his medical needs. Ashley argues that MDOC Defendants' failure to order proper fitting pants caused "scar tissue in [his] ureters" (ECF No. 83, PageID.1212), pointing to CT scans on March 20th and December 26th, and asserts that the "[n]on-opacification [noted in those reports] can be caused by scar tissue in the ureters. The scar tissue is caused by infection, and the scarred tissue does not allow for proper absorption of the contrast dye used in CT Scans." (*Id.*, PageID.1213). However, Ashley is not a licensed medical professional, and his conclusory assertions do not constitute expert medical evidence. Nowhere in these radiology reports does Dr. Decker state the reason for this non-opacification, let alone mention any scarring of distal ureters. Indeed, there is no mention whatsoever about belt loop pants. (ECF No. 1-1, PageID.147-48, 169-70). Rather, in support of his assertions, Ashley relies on portions of Dr. Decker's finding that he was ***precluded from accurate evaluation*** precisely because certain segments of ureters in the CT scans were not opacified. (ECF No. 1-1, PageID.147 ("Unfortunately, a slightly longer segment of the left distal ureter is not opacified *precluding its accurate evaluation*) (emphasis added), PageID.169 ("A small portion of each distal ureter is suboptimally opacified *precluding its accurate evaluation*") (emphasis added). For all other ureters able to be accurately assessed, the report reflects that they were "normal." (*Id.*).[13]

---

[13] While Ashley does not mention (much less rely on) this document in his brief, the Court notes that the record contains a letter dated October 27, 2016, from a "Robert Bulten, MD" and a "Gilbert

Finally, Ashley similarly fails to provide any medical evidence that a lack of belt loop pants was causing his UTIs.  Although he points to the fact that Dr. Decker found a medical need for the SAN, Ashley provides no notes, examinations, findings, or statements from his subsequent visits with Dr. Decker (or any other health care professional) regarding the cause of his UTIs while at MCF, much less evidence demonstrating that the use of waistband pants was the suspected source.  Indeed, none of the urinalysis reports he submits say anything about belt loop pants.  (*See, e.g.,* ECF No. 1-1, PageID.156-57, 159-60, 167, 171).

---

Padula, MD" with an organization called, "Humanity for Prisoners" stating:

> After reviewing Carl's detailed and excellent report on the post-operative care for his bladder cancer, it appears that all the appliances and accompanying medications are well being supplied.  The current problem is that because of his height (6'8") and inseam of 40" the usual elastic band prison pants interfere with the drainage of his ostomy, causing leakage and worse, urinary tract infections which have resulted in scarring of one of his ureters, compromising that kidney's function.  In the last 9 months he has had to be treated for UTI 5 times.  Apparently the quartermaster has tried to cobble together regular pants by making them longer, but these fit so poorly that they, too, cause problems with the urine drainage system.  The Health Care doctor has ordered the specified pants per the orders of the University of Michigan Urology department.  Our request is that the University's and Dr. Decker's orders be complied with before further damages is done to Carl's urinary system.

(ECF No. 1-1, PageID.161).  However, there is no basis from which the Court can reasonably construe this letter as "expert medical evidence."  Not only is there no context or explanation as to how Ashley obtained this letter, but the letter states that it is based on "Ashley's [*own*] detailed . . . report" of his situation.  Moreover, there is no indication at all that these HFP doctors ever physically examined (or even spoke to) Ashley, or what records (other than Ashley's own reporting) they reviewed or assessed in arriving at their conclusions.  Rather, the letter reflects a parroting of how Ashley views his post-operative care, with no indication that the HFP doctors had any *personal* knowledge of his actual circumstances or his physical condition.  (*See, e.g., id.* ("After reviewing ***Carl's*** [] ***report*** . . . it *appears* that all appliances and accompanying medications are being well supplied. . . . [but] ***Apparently*** the quartermaster has tried to '**cobble together**' regular pants . . .") (emphasis added).  Accordingly, Ashley cannot rely on this letter to raise a material question of fact regarding this issue.

At bottom, even viewing the evidence in a light most favorable to Ashley, he at most raises a claim that MDOC Defendants' constructed pants were "inadequate," which is not actionable under the Eighth Amendment. *Phillips*, 14 F.4th at 535 (citing *Rhinehart*, 894 F.3d at 737). Accordingly, the MDOC Defendants are entitled to summary judgment on this issue.

### 2. First Amendment Retaliation

Ashley also brings a First Amendment retaliation claim against Boayue, alleging that she ordered a shakedown of his cell as retribution for the grievances he filed regarding his ostomy supplies. A prima facie case for First Amendment retaliation involves three elements: (1) the plaintiff participated in constitutionally-protected activity; (2) the defendant took an adverse action against the plaintiff "likely to chill a person of ordinary firmness" from engaging in the protected conduct; and (3) there is a causal connection between elements one and two – that is, "that the adverse action was motivated at least in part by the plaintiff's protected conduct." *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006) (citing *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc)). The analytical approach in these cases is "intensely context-driven," and while the elements remain constant between cases, "the underlying concepts that they signify will vary with the setting." *Holzemer v. City of Memphis*, 621 F.3d 512, 520 (6th Cir. 2010).

Boayue argues that while Ashley's "grievances are considered protected conduct, the record do[es] not support a finding of the second and third elements for a First Amendment claim for retaliation." (*Id.*, PageID.770-71). In response, Ashley argues that,

after the June 11th shakedown, she confiscated all of his supplies and stated that "because I filed grievances against her, she now has to provide a response to the Regional Administrator." (ECF No. 79, PageID.1175). He asserts that her conduct of "confiscating necessary medical supplies and putting Plaintiff back into the same position of having to ask every couple days for more supplies" is an adverse action. (*Id.*).

Taking Ashley's facts as true, on June 11th, he was called to health care and told by Boayue to "bring all [his] urostomy supplies." (ECF No. 73-3, PageID.1025). Boayue then took him into her office and stated that "because I filed grievances against her, she now has to provide a response to the Regional Administrator." (*Id.*; *see also* Ashley dep., PageID.1112) (testifying that Boayue said, "Because of that grievance that you filed, I had to answer a lot of questions on this stuff and they told me to shake your cell down and see how many supplies you have"). She said that Ashley could no longer have eight changes in his possession, took six, and said he could only keep two. (ECF No. 73-3, PageID.1025). He asked if this was retaliation, and she said, "Yes, file another grievance." (*Id.*). A Step II investigation into Ashley's grievance about the aforementioned incident states that it was "Subrina Aiken, RN" who requested the shakedown as part of an investigation into his grievance complaining about a lack of sufficient supplies, "yet the EHR indicated you were issued more than what was recommended by the ostomy nurse." (*Id.*).[14]

Based on these facts, the Court will assume that Ashley satisfies the first and third

---

[14] Ashley also testified that, "If you're asking me if it's reasonable to check to see if I'm telling the truth on whether or not I have enough supplies, it is reasonable to check to see if I'm telling the truth." (Ashley dep., PageID.1116).

prongs of a First Amendment retaliation claim.  He clearly engaged in protected conduct by filing the grievance that led to an investigation into his complaint about inadequate supplies, and he testified at his deposition that Boayue responded affirmatively when he asked if she was taking his supplies in retaliation.   (Ashley dep., PageID.1112). Nonetheless, Ashley's claim fails on the second prong of showing an adverse action.

As the Sixth Circuit has explained, it is not true "that every action, no matter how small, is constitutionally cognizable":

> Like the definition of protected conduct, however, the definition of adverse action is not static across contexts.  Prisoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before an action taken against them is considered adverse.  The benefits of such a standard are that it is an objective inquiry, capable of being tailored to the different circumstances in which retaliation claims arise, and capable of screening the most trivial of actions from constitutional cognizance. We emphasize that while certain threats or deprivations are so de minimis that they do not rise to the level of being constitutional violations, this threshold is intended to weed out only inconsequential actions, and is not a means whereby solely egregious retaliatory acts are allowed to proceed past summary judgment.  Retaliation against a prisoner is actionable if it is capable of deterring a person of ordinary firmness from exercising his or her [First Amendment rights].

See Thaddeus-X, 175 F.3d at 398.

Applying this precedent, the Sixth Circuit has explained, "'[i]n the prison context, an action comparable to transfer to administrative segregation would certainly be adverse,' as would . . . the deprivation of prescribed pain medication . . ." Smith v. Yarrow, 78 F. App'x 529, 540 (6th Cir. 2003) (quoting Thaddeus-X, 175 F.3d at 396, and citing Hall v. Nusholtz, 234 F.3d 1268 (Table), 2000 WL 1679458, at *2 (6th Cir. Nov. 1, 2000)).  The Sixth Circuit more recently reaffirmed this view in O'Brien v. Michigan Dep't of Corr.,

592 F. App'x 338, 343 (6th Cir. 2014), holding that "a delay in treatment and discontinuance of medication would likely deter a prisoner [], who believed he needed the medication to avoid the symptoms from which he allegedly suffered."

Here, Ashley fails to raise a material question of fact as to whether Boayue's taking of only his *excess* urostomy supplies – to which he was not entitled and was medically determined as inappropriate for him to have – constitutes an adverse action. The record is undisputed that, before his filing of any kites or grievances, it was Boayue's consistent medical determination that Ashley should be restricted to *two* sets of urostomy changes per week, based on the U of M ostomy nurses' recommendation in February 2016. (ECF No. 73-2, PageID.833, 840-41, 944). Thus, when he was found to have *eight* sets of urostomy changes, Boayue left him with the *two* sets he was supposed to have and retained the rest in the clinic. That is entirely different than a "deprivation of prescribed pain medication" or a "delay in treatment and discontinuance of medication" because Boayue's actions still left Ashley with enough supply to meet his prescribed medical needs. *Smith*, 78 F. App'x at 540; *O'Brien*, 592 F. App'x at 343 (6th Cir. 2014). Thus, even viewing these facts in Ashley's favor, he cannot be said to have suffered an actionable "adverse action."[15] Accordingly, Boayue is entitled to summary judgment on Ashley's First Amendment Retaliation claim.

---

[15] To the extent Ashley contends that Boayue or other nurses purposely gave him extra supplies before shaking him down, there is no evidence to support such an assertion, and Ashley testified, "I don't know if it was a result of the grievance that I filed or the health care kites . . . I don't know what the reason was, but they started giving me five at a time rather than two at a time. . . . That happened a couple [of times.]" (Ashley dep., PageID.1110-11). Moreover, none of that changes the fact that he had an excess number of supplies in his cell.

## III.   CONCLUSION

For the reasons set forth above, **IT IS RECOMMENDED** that the MDOC Defendants' motion for summary judgment **(ECF No. 72),** and Boayue's motion for summary judgment **(ECF No. 73)**, be **GRANTED**.

Dated: November 22, 2021                          s/David R. Grand
Ann Arbor, Michigan                               DAVID R. GRAND
                                                  United States Magistrate Judge

### <u>NOTICE TO THE PARTIES REGARDING OBJECTIONS</u>

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.  A party may respond to another party's objections within 14 days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1).  Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on November 22, 2021.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager